## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AMI ENTERTAINMENT NETWORK, INC.,<br>155 Rittenhouse Circle,<br>Bristol, PA 19007<br><br>Plaintiff,<br><br>v.<br><br>GPS GLOBAL, LLC,<br>12555 Orange Drive,<br>Suite 227, Davie, FL 33320<br><br>Defendant. | :<br>:<br>:<br>:<br>: CIVIL ACTION<br>:<br>:<br>: NO.<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

### COMPLAINT

Plaintiff, AMI Entertainment Network, Inc. ("AMI"), by and through its attorneys, Fox Rothschild LLP, hereby files this complaint and alleges the following:

### I.    THE PARTIES

1.    AMI is a Delaware corporation with its principal place of business located at 155 Rittenhouse Circle, Bristol, Pennsylvania 19007.

2.    Defendant GPS Global, LLC ("GPS Global") is a limited liability company registered in Delaware with a place of business located at 12555 Orange Drive, Suite 227, Davie, Florida 33320.

3.    The members of GPS Global are John M. Bailey, Larry Zimmerman and Bradley A. Zucker.  John M. Bailey and Larry Zimmerman are citizens of Florida.  Bradley A. Zucker is a citizen of Ohio.

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000, and there exists complete diversity between all parties.  GPS Global, as a limited liability company, is deemed a citizen of those states in which its members are citizens.  None of GPS Global's members are citizens of either Delaware or Pennsylvania.  Thus, there is complete diversity of citizenship.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the claim arose within the Eastern District of Pennsylvania, and the parties entered into an agreement designating the Eastern District of Pennsylvania the proper venue.

## III.  FACTS

6.      AMI is in the business of developing video gaming software and constructing video gaming terminals as entertainment solutions for bars, restaurants and casinos.

7.      In 2011, GPS Global sought to enter the Oklahoma gaming market for the purposes of delivering Class II Gaming on Indian land pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*.

8.      GPS Global lacked the business expertise to manufacture the video gaming terminals for the Oklahoma gaming market, and entered into negotiations with AMI to supply the video gaming terminals.

9.      On November 9, 2011, AMI and GPS Global entered into an Agreement for Component Supply ("Component Agreement") whereby AMI would provide hardware components identified in the Component Agreement for use by GPS Global in the State of

2

Oklahoma. A true and correct copy of the Component Agreement is attached hereto as Exhibit "A".

10.     On the same day, AMI and Galaxy Products & Services, Inc. ("Galaxy"), an affiliate of GPS Global, entered into an Agreement for Software Modification and Development, Platform and Housing Modification, Intellectual Property Licensing and Component Supply (the "Development Agreement"). The Development Agreement is the subject of an action pending in this Court captioned: Galaxy Products & Services, Inc. v. AMI Entertainment Network, Inc. et al., Civil Action No. 2:12-cv-06963-MAM.

11.     Pursuant to the terms of the agreements, the Development Agreement and Component Agreement are intended to be read "*in pari materia*" (construed together). *See* Exhibit A at ¶ 8.14.

12.     On January 9, 2012, pursuant to the Component Agreement, GPS Global executed a purchase order to AMI for 500 units at a unit cost of $4,500, for a total cost of $2,250,000 (the "Purchase Order"). A true and correct copy of the Purchase Order is attached hereto as Exhibit "B".

13.     After receiving the Purchase Order, AMI built two sample units and shipped them to GPS Global's designated testing and certification laboratory, BMM Compliance, pursuant to the Component Agreement and GPS Global's direction.

14.     AMI was ready, willing and able to manufacture the 500 units and deliver them to GPS Global in a timely manner after BMM Compliance certified the two sample units.

15.     On May 31, 2012, several months after AMI sent the two sample units to BMM Compliance, and receiving no further communication from GPS Global or BMM Compliance, AMI reminded GPS Global that, despite the pending litigation over the Development Agreement,

it expected GPS Global to honor the valid and binding Purchase Order for 500 units pursuant to the Component Agreement.

16.    In response, on July 25, 2012, GPS Global repudiated the Component Agreement, and materially breached the agreement by failing to purchase the 500 units it agreed to purchase under the Component Agreement.

**COUNT I**

**Breach of Contract**

17.    AMI incorporates by reference the foregoing paragraphs as if fully set forth herein.

18.    AMI and GPS Global entered into a valid and binding Component Agreement for delivery of video gaming terminals.

19.    On January 9, 2012, pursuant to the Component Agreement, GPS Global executed and delivered to AMI a valid and binding Purchase Order for 500 video gaming terminal units at a cost of $4,500 per unit, for a total cost of $2,250,000.

20.    AMI performed its obligations under the Component Agreement and sent two units for certification and testing to BMM Compliance.

21.    On July 25, 2012, GPS Global repudiated the Component Agreement, and materially breached the agreement by failing to complete its purchase of the 500 units.

22.    AMI has fully performed its obligations and duties under the Component Agreement.

23.    As a direct and proximate result of GPS Global's breach of contract, AMI has sustained substantial damages in the amount of $2,250,000.00.

WHEREFORE, AMI respectfully request that this Court enter an Order in its favor and against GPS Global in the amount of $2,250,000.00, plus costs, interest and such other relief as the Court deems just and appropriate.

FOX ROTHSCHILD LLP

By:     Ronald J. Shaffer, Esquire
            Amit Shah, Esquire
            Pa. Attorney I.D. Nos. 33621; 208833
            2000 Market Street, 20th Floor
            Philadelphia, PA 19103
            (215) 299-2000/2150(fax)
            rshaffer@foxrothschild.com
            ashah@foxrothschild.com

*Attorneys for Plaintiff,*
*AMI Entertainment Network, Inc.*

Dated: April 17, 2013

# EXHIBIT A

## AGREEMENT FOR COMPONENT SUPPLY

This Agreement for Component Supply (the "Agreement") is made and entered into as of November 9, 2011 (herein, the "Effective Date") by and between AMI Entertainment Network, Inc. (the "Vendor") and GPS Global, LLC (the "Purchaser"). The Vendor is a Delaware corporation with offices at 155 Rittenhouse Circle, Bristol, Pennsylvania 19007. The Purchaser is a Delaware limited liability company with offices at 12555 Orange Drive, Suite 227, Davie, Florida 33320. In this Agreement, either the Vendor or the Purchaser may be referred to as a "Party," and the term, "Parties" is sometimes used to refer jointly to both the Vendor and the Purchaser.

**RECITALS.** The following paragraphs recite some (but not all) of the background and the Parties' general expectations related to the formation of this Agreement.

1.  Of even date herewith the Vendor and Galaxy Products & Services, Inc., an affiliate of the Purchaser (the "Affiliate") have entered into a certain Agreement for Software Modification, Development, Platform and Housing Modification, Intellectual Property Licensing and Component Supply (the "Illinois Agreement"); and

2.  Using the same Components to be supplied under the Illinois Agreement (but not proprietary software of the Vendor) the Purchaser contemplates manufacture of Gaming machines to deliver Class II Gaming on Indian land, under regimes of tribal and federal regulation,

**NOW THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, covenant and agree as follows.

**1**   **Definitions.** In this Agreement, the following terms shall have the meanings herein below assigned to them.

**1.1. "Affiliate"** means, respectively, as to a Party, (a) any of its direct or indirect ultimate parent companies or other equity ownership as may exist from time to time, and (b) any corporation or other juridical entity (i) at least fifty percent (50%) of whose issued and voting capital or equity participation is now or hereafter owned by such Party or directly or indirectly by its ultimate parent companies or other equity ownership. For the purpose of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the work or as applicable, management and policies of a natural person, corporation, or other legal entity, whether through employment, the ownership of voting securities, by contract or otherwise. For

*Proofed on TBB 12/22/11*



the avoidance of doubt, as of the Effective Date, Games Warehouse, Ltd., Nottingham, United Kingdom, is an Affiliate of the Vendor and Galaxy Products & Services, Inc. is an affiliate of the Purchaser.

**1.2. "Aggregate Damages Limitation"** is defined in **Section 8.2** of this Agreement.

**1.3. "Class II"** means bingo, lotto and pull tabs, conducted with or without technologic aids, all as defined under the Indian Gaming Regulatory Act of 1988, regulations and final agency actions of the National Indian Gaming Commission and the federal jurisprudence of all of the foregoing.

**1.4. "Component"** means those component parts (including commercially-available parts) identified on **Schedule 1** of this Agreement. The Vendor's proprietary game software is not a Component. The term includes commercially-available third-party computer software to the extent (and only to the extent) listed on **Schedule 1.**

**1.5. "Continuing Cure"** means all available and commercially reasonable actions that are initiated by a Party within thirty days after such Party's receipt of Notice of a breach of or default under this Agreement and that such Party diligently and continuously prosecutes until the breach or default is completely cured.

**1.6. "Effective Date"** is defined in the first paragraph of this Agreement.

**1.7. "Gaming"** means the concurrence of chance, consideration and prize in an electronic game machine, regulated or permitted as gaming or gambling by statute or a governmental regulatory entity. The term includes Indian gaming, charitable gaming, commercial gaming, state lottery gaming and casino gaming but does not include electronic machine games of chance by legislative exception determined to be unregulated or quasi-regulated amusement for prizes under state exception statutes.

**1.8. "Illinois Agreement"** is defined in the recitals to this Agreement.

**1.9. "Intellectual Property"** means that certain intellectual property identified in **Schedule 3** of this Agreement.

**1.10. "List Price"** means the Component price charged by the Vendor to the Purchaser pursuant to **Section 3** of this Agreement, and as further set out in **Schedule 1** of this Agreement.



**1.11. "Notice"** means notice given and served in accordance with **Subsection 8.1** of this Agreement.

**1.12. "Products"** means finished goods manufactured by the Purchaser and sold only as Class II technologic aids for lawful use by Indian Tribes on Indian Land.

**1.13 "Territory"** means the state of Oklahoma.

**1.14. "Term"** is defined in **Section 2** of this Agreement.

2.   **Term and Termination.** The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue in full force and effect until October 31, 2018.

3.   **Component Supply**

**3.1. Agreement to Supply; Price Protection.** The Vendor agrees to sell to the Purchaser, for the List Prices set out in **Schedule 1** hereof and upon the terms set out in this **Section 3**, such Components as the Purchaser may during the Term, from time to time determine to purchase from the Vendor, it being understood that (a) the Purchaser shall be under no obligation to purchase any Components and (b) that the Components shall be only for use inside the Territory.

**3.2. Terms of Sales.** All sales shall be FAS the Purchaser's designated facility in the contiguous continental United States as designated in the Purchaser's purchase order and paid for on terms of Net 30 days of the latter of delivery or Purchaser's receipt of invoice. It is agreed however that the Vendor shall send invoices to the Purchaser, for Components shipped, at the time of shipment and that title to the goods shall pass on delivery of the goods to the carrier. Such invoices shall include any warranty, delivery dates, shipment or other terms as applicable regarding the Components. The list prices stated in **Schedule 1** of this Agreement are gross, include all duties, taxes, freight costs and insurance costs, except only any use taxes, and are subject to indexing adjustment as of June 30, 2013, June 30, 2015 and June 30, 2017, in each case subject to the formula and procedure set out in **Schedule 1** of this Agreement. Delivery shall be as scheduled by the Parties but in any event, absent prior written agreement between them, shall be no later than thirty (30) days post receipt of a purchase order. Overdue amounts for Component purchases shall bear interest at the rate of one percent (1%) per month or fraction thereof. The Vendor's warranty for tangible goods sold to the Purchaser shall be as



provided in **Schedule 2** of this Agreement. Both Parties hereby give ongoing notice of standing objection to terms of sale that are different from or additional to terms of sale and those other terms set out in this Agreement.

**3.3. Sale of Components as Sub-Assemblies.** Unless in any instance the commercially-available third-party computer software licenses referred to in **Schedule 1** to this Agreement are not ordered in conjunction with order of computers, all computer Components shall be delivered with third-party commercially available operating software pre-loaded, it being understood that the Purchaser is to load all other computer software during the Purchaser's manufacturing process. Computers and locks shall be sold and delivered separately and not, when delivered, integrated with any other Component as a subassembly. Otherwise, the Vendor shall at its sole cost and expense deliver all other Components pre-assembled into subassemblies in accordance with reasonable instructions from furnished to it by the Purchaser.

**4    License of Intellectual Property.**

4.1    License.  Vendor hereby grants to Purchaser a non-exclusive royalty-free license to make, manufacture, program, promote, display, provide, accept wagers on, offer for sale, sell, import and export Components that embody the intellectual property as set forth in Schedule 3 ("Intellectual Property") in the Territory for use during the Term. For the avoidance of doubt, Vendor is not by this Agreement precluded from using, promoting, distributing, selling or manufacturing Components in the Territory or outside of the Territory. The license set forth in this **Section 4** shall include all Intellectual Property necessary for Purchaser to use the Components irrespective of whether such Intellectual Property is listed in **Schedule 3.** The license shall also include the right to sub-license to all end users within the Territory for its intended purposes in accordance with this Agreement.

4.2    Limitation on Rights Granted. The Purchaser agrees that it is hereby acquiring no rights to use the Intellectual Property outside of the Territory and that all rights of the Vendor in the Intellectual Property not expressly granted hereunder are reserved exclusively to the Vendor, its Affiliates, successors and assigns.

4.3    Quality Control.    Vendor shall have the right to control the quality of the Components for which the Purchaser uses the licensed Intellectual Property, including any Vendor trade dress. Purchaser agrees to meet the existing quality standards now in effect with respect to the Components. Purchaser shall permit Vendor or its representative at reasonable times and intervals to inspect the Components or products incorporating the Components



provided by the Purchaser. Purchaser shall also upon request by Vendor send by express courier, representative samples of such products, advertising, packaging and/or promotional materials that incorporate the licensed Intellectual Property, including the trade dress, so that Vendor may review the proposed use and inspect the quality of such materials. Vendor reserves the right to disapprove in writing such products, advertising, packaging and/or promotional materials if Vendor reasonably determines that the Licensed Intellectual Property is improperly used therein or that the items inspected therein do not meet quality standards. If Purchaser fails to comply with the existing quality standards, Purchaser shall take adequate measures to come into compliance with such standards within sixty (60) days after written notification by the Vendor. If at the end of such sixty (60) day period, Vendor is not reasonably satisfied that the quality of the services and products provided under the licensed Intellectual Property meets such standards, Vendor may terminate this Agreement upon written Notice to Purchaser. If Purchaser does not receive written disapproval from Vendor within fifteen days of receipt of the samples by Vendor, then the samples will be deemed approved. Upon approval, submitted samples shall be returned to the Purchaser at the Vendor's sole cost and expense.

5   **Representations and Warranties of the Vendor.** The Vendor represents and warrants to the Purchaser as follows.

    **5.1.** The Vendor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

    **5.2.** The Vendor has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. All corporate acts and other proceedings required to be taken to authorize such execution, delivery, and consummation have been duly and properly taken and obtained.

    **5.3.** This Agreement has been duly executed and delivered by the Vendor and constitutes legal, valid and binding obligations of the Vendor and is enforceable against the Vendor in accordance with its terms.

    **5.4.** No approval, authorization, consent, or other order or action of, or filing with, any court, administrative agency, or other governmental authority is required for the execution and delivery by the Vendor, of this Agreement.

    **5.5** To the Vendor's knowledge, none of the execution, delivery or performance of this Agreement by the Vendor conflicts with, or results in, a breach under the



articles of incorporation, by-laws or contractual undertakings of the Vendor or its Affiliates.

5.6 To the Vendor's knowledge, the Vendor has not entered into (and after the Effective Date will not enter into) any written or oral agreement that would be inconsistent with its obligations under this Agreement or that would deprive the Purchaser of the benefits of this Agreement.

6. **Representations and Warranties of the Purchaser**. The Purchaser represents and warrants to the Vendor as follows.

   6.1    The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

   6.2 The Purchaser has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

   6.3 All corporate acts and other proceedings required to be taken to authorize such execution, delivery and consummation have been duly and properly taken and obtained.

   6.4 This Agreement has been duly executed by the Purchaser and constitutes legal, valid and binding obligations of the Purchaser in accordance with its terms.

   6.5 No approval, authorization, consent or other order or action of or filing with any court, administrative agency, to other governmental authority is required for the execution and delivery by the Purchaser of this Agreement or the performance by the Purchaser of its duties under this Agreement.

   6.6 None of the execution, delivery, or performance of this Agreement by the Purchaser (i) conflicts with or results in a breach under the articles of association, by-laws or contractual undertakings of the Purchaser or any of its Affiliates, or (ii) conflicts with or results in a violation of any of the laws of the Purchaser's corporate domicile, or is inconsistent with any contract entered into by the Purchaser.

7. **Dispute Resolution**. The Parties intend that this Agreement be not interpreted, construed or applied as a mere legal agreement but rather as an honorable undertaking pursuant to which both Parties commit to good faith, reasonableness, candor, fair dealing and commercially reasonable diligence. In the event that at any time or from time to time the Parties shall fail to agree on any material matter relating to this Agreement or their respective performances under it, or in the unanticipated event that



either Party shall breach this Agreement, on the Notice of either Party the matter shall be referred to dispute resolution mediation in accordance with the rules of commercial mediation of the American Arbitration Association in Philadelphia, Pennsylvania.

## 8    Other Provisions.

**8.1 Notices.** Any notice or other communication required or permitted to be given by any Party under this Agreement shall be given and served only by United States Postal Service, registered or certified mail, postage prepaid and return receipt requested, addressed to the recipient Party at the applicable address stated below.

To the Vendor:

AMI Entertainment Network, Inc.
Attention: Chief Executive Officer
155 Rittenhouse Circle
Bristol, PA 19007

With a copy to:
Dickstein Shapiro, LLP
Attention: Jon D. Grossman, Esq.
1825 Eye Street, NW
Washington, DC 20006-5403

To the Purchaser:

GPS Global, LLC
Attention: Chief Executive Officer
12555 Orange Avenue, Suite. 227
Davie, FL 33330

Such Notices shall be deemed duly served when received or refused. Each Party shall have the ongoing prerogative to change its address for receipt of Notices, by giving Notice to the other Party.

**8.2 Damages for Cost of Covering Performance in Event of Breach; Exclusion of All Other Kinds of Damages; Aggregate Limitation of Liability for All Damages.** In the event that the Vendor shall materially breach this Agreement and further, upon Notice, shall fail to duly and timely cure the breach, by Continuing Cure if applicable, then upon further Notice to the Vendor the Purchaser shall have the prerogative to procure covering performance by a person not a party to this Agreement and, subject to the aggregate limitation on



the amount of damages that a Party can collect for breach of this Agreement, as hereinbelow set out, the Purchaser shall be entitled to collect from the Vendor, as contract and incidental damages, the Purchaser's demonstrable costs, including incidental costs, of procuring such covering performance. Except as expressly hereinabove set out, no Party or Affiliate thereof, or any trustee, director, officer or employee of such Party or Affiliate shall be liable for any of the following types of damages: special damages, incidental damages, consequential damages, punitive damages, indirect damages, economic loss due to any of (1) injury to property, (2) lost profits, (3) loss of business opportunity, or loss of data. Neither Party nor any Affiliate of either shall be entitled to any recovery in respect of such excluded types of damages, regardless of any failure of essential purpose or whether the possibility of loss was foreseeable. In any event, the liability of either Party for damages for breach of this agreement together with any other agreement between the Parties or between the Vendor and the Affiliate, shall not collectively exceed the aggregate sum of one million dollars ($1,000,000.00) (the "Aggregate Damages Limitation") for all breaches and entitlements to damages not categorically excluded hereunder. For the avoidance of doubt, the Aggregate Damages Limitation shall apply to both this Agreement and the Illinois Agreement as if they were one and the same agreement.

**8.3. Amendments.** No amendment, modification or addition hereto shall be effective or binding on either Party unless set forth in writing and manually executed by duly authorized representatives of both Parties with the same formalities with which the Parties have executed this Agreement.

**8.4 Waiver.** No waiver of any rights under this Agreement shall be deemed effective unless contained in writing manually signed by the Party charged with such waiver. No waiver of any breach or failure to perform shall be deemed a waiver of any future breach or failure to perform or any other right arising under this Agreement.

**8.5 Headings.** The section headings contained in this Agreement shall not be deemed to imply that the topic stated in the heading is not addressed in parts of this Agreement other than under the heading or that only the topic indicated by the heading is addressed in the section to which the heading pertains.

**8.6. Applicable Law, Jurisdiction and Venue.** Except as may be expressly provided in this Agreement, this Agreement shall be governed by, subject to and construed in accordance with the laws of the Commonwealth of Pennsylvania, but without giving effect, however, to applicable principles of conflict of laws to the extent that the application of the law of a jurisdiction other than Pennsylvania would be required thereby. The Parties agree that the



United States District Court for the Eastern District of Pennsylvania and the Common Pleas Court of Philadelphia County, Pennsylvania, shall have exclusive venue and jurisdiction to adjudicate all disputes litigated between the Parties.

**8.7. Severability.** If any provision of this Agreement is held by court or governmental agency (both) of competent jurisdiction to be invalid, void or unenforceable for any reason, This Agreement shall be deemed adjusted if possible rather than voided in its entirety, so as to achieve the intent of the Parties to the maximum extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the fullest extent possible.

**8.8. Assignment; Binding Effect.** Neither this Agreement, nor any obligations or rights hereunder, shall be assignable, in whole or in part, by either Party hereto by operation of law or otherwise, without prior written consent of the other Party; provided however that the Vendor may assign this Agreement or any other obligations or rights hereunder, in whole or in part, upon Notice to the Purchaser, but without the consent of the Purchaser, to the Vendor's Affiliates or in connection with the sale or transfer of substantially all of the assets and business of the Vendor, whether by merger, sale of Control, operation of law to otherwise. Any purported assignment in contravention of this **Section 7.8** shall be null, void and of no effect.

**8.9. Further Assurances.** The Parties agree to execute, acknowledge and deliver such instruments, and to do all such other acts as may be necessary or appropriate in order to carry out the intent of the Parties as expressed herein.

**8.10. Force Majeure.** No Party shall be liable for any failure or delay in performance under this Agreement to the extent that such failure or delay arises from *force majeure. Force majeure* means any casualty event outside the control of the affected Party. *Force majeure* does not include a court injunction against a Party's performance or failure or inability for any reason to pay money when due. In the event of the occurrence of a *force majeure,* the Party so affected shall give prompt written Notice to the other Party, stating the period of time the effect of the *force majeure* is expected to continue and shall use commercially reasonable, ongoing and diligent efforts to end the failure or delay.

**8.11. Publicity.** No public announcement concerning the existence of or the terms of this Agreement shall be made, either directly or indirectly, by the Vendor or the Purchaser, except as may be legally required without first obtaining the approval of the other Party and its agreement upon the nature, text and timing



of such announcement, which approval shall be withheld at the relevant Party's sole, arbitrary and absolute discretion.

**8.12. Third-Party Beneficiaries.** The Affiliate is an intended third-party beneficiary of this Agreement. Except as expressly provided in this Agreement, no person other than the Purchaser and the Vendor and such Parties' respective permitted assignees shall be deemed an intended third-party beneficiary of this Agreement or otherwise have any right to enforce any obligation of this Agreement.

**8.13. Affiliates of Parties.** Either Party may perform its obligations personally or through one or more Affiliates and shall be responsible for the performance of such obligations and any liabilities resulting therefrom. Neither Party shall permit any of its Affiliates to commit any act (including omission in breach of a duty to act) that such party is prohibited hereunder from committing directly.

**8.14. Entire Agreement; Relationship with the Illinois Agreement.** This Agreement contains the entire and fully-integrated agreement between the Parties with respect to the sale of Components for the Purchaser's manufacturing operations to produce Products. Except as expressly below stipulated, any prior agreement, arrangement or undertaking between the Parties, whether oral or in writing regarding such sale of Components is hereby superseded; provided however that it is intended to be *in pari materia* with the Illinois Agreement and does not supersede it. In any event, though the Illinois Agreement grants to the Affiliate limited intellectual rights in respect of the field of use stated in the Illinois Agreement and the territory and term therein defined, no intellectual property rights are granted to the Purchaser under this Agreement except those expressly set out herein, and this Agreement shall not be read to mean or imply that limited intellectual property rights granted under the Illinois Agreement are in any way expanded. For purposes of **Section 8.3** of the Illinois Agreement, two thirds (2/3) of the amounts that the Purchaser may pay to the Vendor for Components purchased under this Agreement shall for purposes of the accounts between the Vendor and the Affiliate be treated as if such amounts were paid for Components purchased under the Illinois Agreement. If under **Section 8.4** of the Illinois Agreement the Purchaser shall become entitled to recoupment of any part (or all) of payment of the Additional Development Fee provided for under the Illinois Agreement, then the Purchaser shall have the right to apply the same purchase discounts for recoupment purposes stipulated under the Illinois Agreement to purchases made under this Agreement during the same times and subject to the same limitations as are stipulated under the Illinois Agreement. In distinguishing between Component purchases made under the Illinois



Agreement and Component purchases made under this Agreement, in the event of a dispute between the Parties, the burden of substantiation shall be that of the Purchaser.

**8.15. Multiple Counterparts.** This Agreement may be executed in four counterpart originals, each one of which when executed and delivered shall be an original document, all such counterpart originals being deemed one and the same agreement.

   **IN WITNESS WHEREOF** the Parties have executed this Agreement as of November 9, 2011, the date first above written.

**The Purchaser**                         **The Vendor**

**GPS Global, LLC**                       **AMI Entertainment Network, Inc.**


By: _____              By: _____
John M. Bailey, Manager                   Michael G. Maas, President



# SCHEDULE 1
## TO
## AGREEMENT FOR COMPONENT SUPPLY

### Component Item Prices



COMPONENT PARTS

| | | | |
|---|---|---|---|
| MP0208-01 | Evolution Lower Door Moulding | | 60.51 |
| MW1773-01 | Acrylic Holder Lower door | | 8.76 |
| MW1774-01 | Mount Strip | | 3.01 |
| MP0209-01 | Acrylic Window | | 7.21 |
| MP0206-01 | Cup Holder LH | | 13.20 |
| MP0207-01 | Cup Holder RH | | 13.20 |
| MW1775-01 | Drink Shelf Bracket RH | | 2.40 |
| MW1776-01 | Drink Shelf Bracket LH | | 2.40 |
| **MW1791-01** | Lock Bar Runner | | 3.06 |
| **MW1792-01** | Meter Bracket | | 3.20 |
| MP0213-01 | Acrylic Meter cover | | 9.36 |
| MW1789-01 | Cover Plate, Printer/Meter | | 4.80 |
| **MW1793-01** | Cover Plate, BA | | 4.80 |
| **EC0433-01** | 3 Way LED Strip | | 4.53 |
| MW1762-01 | LOWER DOOR BLANKING PLATE ASM | | 12.51 |
| EC0430-01 | CAB,PWR,CPU | | 11.49 |
| MP0210-01 | Evolution Upper Door Moulding | | 32.00 |
| MW1771-01 | Button Panel | | 21.47 |
| MW1772-01 | Blanking Plate, Player Track | | 5.82 |
| MW1770-01 | Center Plate | | 8.74 |
| SW0007-01 | Black Push Button GPB315 | | 7.00 |
| EC9265-01 | 4 OHM Oval Speaker XF-215-304 | | 4.14 |
| MP0205-01 | Acrylic Top Panel | | 21.78 |
| EC9393-01 | 19" LTG-1935MGN (TN) Monitor With Toughened Glass | | 350.00 |
| MP0211-01 | Acrylic Edge LH | | 30.10 |
| MP0212-01 | Acrylic Edge RH | | 30.10 |
| MW1757-01 | UPPER DOOR BLANKING PLATE | | 17.74 |
| MW1769-01 | SUPPORT BRACKET | | 2.32 |
| MW1758-01 | UPPER DOOR TOP COVER PLATE | | 8.40 |
| MW1767-01 | FILLER | | 2.19 |
| **SA0655-01** | 19" monitor and touchscreen assembly | | 568.40 |
| MW1766-01 | LOCK PLATE | | 17.78 |
| MW1760-01 | CHASIS RAIL LH | | 22.14 |
| MW1761-01 | CHASIS RAIL RH | | 22.14 |
| **EC0433-01** | 3 Way LED Strip | | 4.54 |
| EC0413-03 | ASSY,CAB,EVOL,MAIN,2 | | 63.97 |
| EC0436-01 | Audio Cable | | 9.89 |
| EC0437-01 | Topper light | | 31.55 |
| HW8862-01 | LOOM,CORR,.75ID | | 1.06 |
| MW1794-02 | Gas Strut Bracket LH | | 2.40 |
| MW1795-02 | Gas Strut Bracket RH | | 2.40 |



| | | | |
|---|---|---|---|
| MW1801-02 | Top Door Hinge | | 24.00 |
| EC8500-01 | Quixant Qxi-200 Dual Core | | 735.00 |
| MW1790-01 | Quixant HD bracket | | 8.00 |
| EC0431-01 | Quixant Data/PWR cable | | 0.00 |
| EC7542-01 | Sanken Video Gaming PSU (+12v & +24v) | | 132.00 |
| EC0360-06 | Sata Drive 300Gb | | 67.20 |
| WD0083-01 | Evolution Wood Cabinet | | 315.00 |
| MW1778-01 | Lower Lock Bar | | 14.84 |
| MW1779-01 | Lower Lock Bar Runner | | 5.76 |
| MW1780-01 | Padlock Reciever | | 2.38 |
| MW1781-01 | Blanking Plate, Lock | | 2.80 |
| EC9697-01 | Printer Gen2 | | 485.80 |
| EC9696-01 | BZL,MDL,PRINTER,GEN2 | | 48.00 |
| EC9785-01 | Ardac Elite Bill acceptor with bezel | | 655.00 |
| SW0009-01 | Test Switch Rocker Arcolectric C1500VQAAJ | | 1.45 |
| SW0008-01 | D Pole Door Switch | | 4.49 |
| MW1782-01 | Door Switch Bracket | | 1.03 |
| HW8762-01 | Lock Cam 40mm | | 1.06 |
| HW8751-01 | 250 Locks PT. No. 1342 | | 2.51 |
| MW1783-01 | Lower Door Hinge | | 31.71 |
| MW1784-01 | Rocker Switch Bracket | | 0.95 |
| MW1785-01 | Bracket Gen2 Support Plate | | 8.00 |
| MW1786-01 | BA Metal case Assy | | 48.00 |
| HWXXXX | Lock Assy (BA Case) | | 4.80 |
| MW1787-01 | Bracket, Meter | | 4.80 |
| MW1764-01 | BLANKING PLATE LH | | 9.06 |
| MW1765-01 | BLANKING PLATE RH | | 9.06 |
| MW1753-01 | FRONT FLANKING PLATE LH | | 14.93 |
| MW1754-01 | FRONT FLANKING PLATE RH | | 14.16 |
| MW1759-01 | CABINET BASE PLATE | | 49.14 |
| MW1768-01 | PL,MTG,CONN,EVOL | | 2.62 |
| SW7007-01 | Refill Key  87000 | | 7.68 |
| HW8427-01 | Gas Strut Bracket 4262 | | 2.45 |
| HW8447-01 | 434102 Gas Strut Infinity  588811-200N | | 6.74 |
| EC9416-01 | DC Fan 12V 120 X 25mm KD1212PTB3-6A.GN | | 17.56 |
| HW9008-03 | 120mm Fan Guard | | 0.95 |
| EC9154 | Meters | | 4.96 |
| EC0413-02 | ASSY,CAB,EVOL,MAIN,1 | | 24.86 |
| EC0413-04 | ASSY,CAB,EVOL,SW | | 10.48 |
| EC0434-01 | CAB,SPLTR,12V | | 8.19 |
| EC0435-01 | CAB,PWR,LCD,EVOL | | 12.77 |
| EC0344-03 | AC Inlet Cable | | 4.80 |
| ECXXXXX | Ground Harness | | 8.00 |
| SAXXXX | LED Light Assy - Meters | | 8.00 |
| MWXXXX | Lock Bracket - upper door lock | | 3.20 |
| HWXXXX | Lock - upper door | | 4.80 |
| HWXXXX | Louver | | 8.00 |
| MWXXXX | Bracket Power Supply Mount | | 3.20 |



| HWXXXX | AC Inlet Box | | 1.20 |
| HWXXXX | AC Inlet Box Cover | | 0.80 |
| 9000000 | Windows XP | | 85.00 |

The List Prices for the Components identified in this **Schedule 1** are subject to adjustment as of June 30, 2013, June 30, 2015 and June 30, 2017 (the "List Price Adjustment Dates"). For the purpose of these adjustments:

> "Price Index" means the United States Bureau of Labor Statistics Producer Price Index for computer and electronic product manufacturing, December 2003 base 100.

> "Base Price Index" means the Price Index for March, 2012.

The List Price adjustments shall be made by multiplying the List Price of each Component shown on this **SCHEDULE 1** as of the Effective Date, by a fraction, the denominator of which is the Base Price Index and the numerator of which is the Price Index for the month which contains the List Price Adjustment Date.

The List Price adjustments shall be subject to being made effective only by the Licensor's Notice given during the month containing the List Price Adjustment Date but shall in no case be effective retroactively to the Licensee's receipt of the Licensor's Notice of List Price adjustment or apply to Component orders placed by the Licensee prior to the Licensee's receipt of the Notice. To be effective, the Notice shall contain a revised **SCHEDULE 1** showing all List Prices as adjusted and a statement of the Price Index for the month which contains the List Price Adjustment Date.

If the Price Index ceases to use the December 2003 average equaling 100 as the basis of calculation, or if a change is made in the term or number of items contained in the Price Index, or if the Price Index is altered, modified, converted or revised in any other way, then the Price Index shall be adjusted to the figure that would have been arrived at had the change in the manner of computing the Price Index in effect at the Effective Date not been altered. If such Price Indexes shall no longer be published by the United States Bureau of labor Statistics then any substitute or successor index published by the Bureau of Labor Statistics or other governmental agency of the United States, and similarly adjusted as aforesaid, shall be used. If such Price Index (or successor or substitute index similarly adjusted) is not available, a reliable governmental or other reputable publication selected by the Licensee and evaluating the information theretofore used in determining the Price Index, shall be used.



SCHEDULE 2
WARRANTY

A. <u>Warranty</u>.

1. For component (OEM style current policy) only:

- 1 year warranty on motherboards.
- 90 days for everything else.



SCHEDULE 3
INTELLECTUAL PROPERTY

A.    Copyrights.

1    All system software (including but not limited to menu system, shell, GW system library software).
2    Credit board hardware design.
3    Credit board firmware.
4    All Licensor Tools and Technology.

B.    Patents.

U.S. App. No. 11/381,379 "Amusement Device Prize Awarding System and Method".
U.S. Patent No. 6,997,376 "Anti-tether device".
United Kingdom Application No. GB 1019085.8 "Gaming Terminal".

C.    Trade Secrets.

To be identified by joint memorandum.

D.    Trademarks.
None



# EXHIBIT B

## GPS Global, LLC

12555 Orange Drive, Suite 227
Davie, FL 33330
Phone: (954) 452-1277
Fax:   (954) 416-1769

PURCHASE ORDER

**DATE:**     1/9/2012
**P.O. #**     101

**VENDOR**
AMI Entertainment Network
155 Rittenhouse Circle
Bristol, PA 19007
Phone: (800) 523-2760
Fax:   (215) 826-1401

**SHIP TO**
To be determined

| REQUISITIONER | SHIP VIA | F.O.B. | SHIPPING TERMS |
|---|---|---|---|
|  |  |  |  |

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|---|
|  | Units for Oklahoma Tribal Casinos, per Agreement For Component Supply, dated November 9, 2011. | 500 | 4,500.00 | 2,250,000.00 |

|  |  |
|---|---|
| SUBTOTAL | $ 2,250,000.00 |
| TAX RATE | 0.000% |
| TAX | $ - |
| S & H | $ - |
| OTHER | $ - |
| TOTAL | $2,250,000.00 |

**Other Comments or Special Instructions**

_John Bailey_
Authorized by

_1-9-2012_
Date